David Weimert's personal involvement and participation in the pre-contractual negotiations of the ultimate deal in this case resulted in a 33 percent increase in capital to the bank than what they were willing to take. It also resulted in the bank being relieved of a 15 million dollar liability. Contrary to the government's position, Mr. Weimert's involvement in these pre-contractual negotiations was not a crime. Number one, he made disclosure of his involvement. The very first letter of intent that began to be circulated among the parties was sent by Attorney Peter Shek at Mr. Weimert's direction to Mr. Kalka, a and to Mr. Timmerman for circulation among the IDI board. Mr. Weimert's bonus and involvement was not hidden. It was not under the table. There was no agreement with these third parties of an undisclosed kickback. Second, the letters of intent themselves, these pre-contractual documents. Mr. Weimert's involvement, the purchase price, the financing terms, they were all contingent terms. There was a paragraph in each letter of intent, and when I say each I'm talking about the one drafted by Attorney Peter Shek, the one submitted by Mr. Kalka, the one submitted by Mr. Burke, that explicitly provided that these terms aren't binding. And when the government, in its brief, said the various letters of intent were mere images of each other, they clearly were not. The Peter Shek letter of intent, the very first one, had Mr. Weimert buying the 50% interest with a right to assign for the price of $8.5 million. The Kalka letter of intent changed those terms. I'm buying 45%, Mr. Weimert 5%, and by the way, Mr. Weimert's going to pay me $100,000. And Mr. Kalka, the purchase price was $8.5. The Burke letter of intent rewrote those terms as well. They said, we're only going to offer $8 million, and you're going to give us better financing terms than what Kalka is asking for. Mr. Meyer, can I ask you a quick question on maybe a bit of a side issue? In the transaction that closed, if I got it straight, that Anchor Bank lent most of the money that the Burkes used to pay that cash? That's correct, Your Honor. Do we know whether that loan was a recourse loan or a non-recourse loan? I do not know. It was, the evidence in the case in part ended with the board meeting and the additional evidence that was introduced was, I'm sorry, the additional evidence that was introduced concerning the final transaction was it closed on March 31st, that there was a contractual, a definite purchase agreement reached sometime between the board meeting and the closing on March 31st, and the Burkes renegotiated the purchase price. It got reduced from $8 million to $7.7 million. The reason I'm asking is I'm looking at your chart on page 16 of your brief, and I'll follow up on one other thing about the bonus, but this looks to me like a way to move more than the Burkes, IDI, and the holding company up to pay off that line of credit. Absolutely, that's what I believe happened. Can I ask you one quick question also? The bank paid Mr. Weimert's bonus in this transaction, right? That's correct. Do we know whether it was reimbursed by IDI? No, and as a matter of fact, I think a logical inference of that is because Mr. Petershack wanted to take the bonus out of the closing, and Mr. Timmerman said, no, no, the bank will pay it. I think an inference from those two facts, a logical inference, is that they were able to upstream an additional $300,000 to, on their outstanding note. Mr. Weimert, let me get to the heart of this if I can now. I understand your points about disclosure and pre-contractual arrangements. The government's position is, well, kind of he planted the seed with that conversation with Petershack. We've got a standard for materiality in the law that says it's enough just to be capable of influencing decision makers. We've got precedent that says misrepresentations need not be matters of fact. Opinions can count, half-truths can count if they mislead people, and we also have law that tells us misrepresentations don't have to be made directly to the victim, and that victims don't have to be smart, careful, or sensible, right? I think we have to accept all of those propositions as matters of law. At the same time, I'm very concerned by the application of the federal wire fraud to statements about parties negotiating positions. That is, what terms are important in this deal to whom? I have not found any case law treating those sorts of representations by anybody under any circumstances as material for purposes of federal fraud statutes. Well, and I think it is especially true when you have who the third parties are here. Mr. Kalka and Burks, they are negotiating in their own self-interest in a pre-contractual situation. I mean, to further their self-interest, I'm sorry. And it really comes down to, if you take the logic of the government's case out to its endgame, Mr. Weimer never disclosed to Burks or Kalka that the bank was willing to take $6 million rather than $8 million. We have a $2 million omission, for lack of a better description, and... And that sounds fraudulent under that theory as well. Exactly. Exactly. And so we have this material omission, and I'm sitting there, and this has always bothered me about the case from the get-go. Are you telling me that negotiating among sophisticated parties, and everybody's looking out for their self-interest, and we're in negotiations that a potential buyer, you've got to disclose your bottom line? I mean, that's, when I first looked at this case, that's what just, I couldn't get my hands around it. I agree with that, and I have considerable sympathy for that view. Let me tell you, though, what bothers me on your side of the case, okay? Because, first of all, we've got the defendant's, Mr. Weimer's, statement to Petershack before that first template LOI is drafted that tells him falsely, we have to assume, that the IDI board has approved his taking a piece of this deal. But, can I answer that quick, Your Honor, before I forget that? Sure. I've got a couple of those, but go ahead, go ahead. That first one is, well, wait a minute. He directs Petershack to send it to the IDI board. Here's what we're thinking about. Here's what we're talking about, and it goes to Mr. Timmerman. Mr. Timmerman testifies about that. Mr. Timmerman testifies that he distributes it among the board, or Mr. Timmerman go back to Mr. Weimer and say, hey, we never agreed about this 4%. No, nothing in the record to that regard. Okay. The second thing that concerns me regarding the board meeting, the critical board meeting, Mr. Weimer told the SEC, if I recall correctly, that he described his role to the board as a, quote, earmark. I don't know exactly what an earmark is, but I guess it's different from a make-or-break term of the deal. And nobody else in that meeting remembers him describing it that way. They all testify, if he's not in the deal, their understanding was the deal's dead. Right. This is going to be a two-step response, so I hope I addressed the court's inquiry. We have five counts remaining. The first four counts deal with all the interactions between the IDI, or I'm sorry, yes, the IDI board. But it deals that that count, count five, addresses the two, or the fax transmission that was sent to the board before the meeting. So the oral statements are not a count in themselves. No, that really doesn't matter, though. Okay, but now I get to part two. The oral statements, I assume the court is saying, lookit, we can look at that to consider, you know, whether this was a misrepresentation, etc. Similarly, we can look at the fact that the board at Jackson and Timmerman's direction restructured the LOI after the meeting. They took Weimert out of the deal, and it was just a letter, or a letter that Weimert said, contingent upon you making that purchase, I will give you $100,000 for four and seven days. So they took him out of the deal, and by the time that was- They turned it into a side deal, basically. Right. And that wasn't Mr. Weimert's idea, that was the board's attorney. And by the time that happened, there was no written provision anywhere that provided for the payment of Mr. Weimert's bonus, anywhere. And, I mean, think about the bonus. I'm sorry, you got another one, I thought. Well, the other one that I can see, I'm going to be very curious to hear about the origins of this prosecution, to the extent the prosecution is willing to share it, but I gather that Mr. Omachinsky probably and Timmerman took some offense at Mr. Weimert's response at the time of that board meeting, where they ask him point blank, in essence, without you in the deal, does the deal go forward? And he said no. And he's purporting to speak, in essence, for the buyer's negotiating position, they're the Berks. We have to assume that's false, it's intentionally false. I don't think you have to assume it's false, number one, because by the time that conversation took place, there was an LOI from the Berks requiring that. Well, sure, but this goes back to the main problem. There's an LOI saying that, but every term is always going to be up for negotiation, right? Right, exactly. And, Your Honor, just so we're clear, Mr. Omachinsky and Mark Timmerman were not members of the IDI board. Mr. Omachinsky was the lead director of the holding company's board, so he had no ability to dictate the terms at the end. He wasn't even at the board meeting. He's the board of the parent company, though, right? Presumably, this is a kind of all-hands-on-deck, we've got this huge payment we've got to make, markets are tanking everywhere, everybody's scrambling to find cash, even if it's coming from the TARP money, right? Correct. So, okay. Can I ask you, if I could, I know we're out of time here, but this case is, I hope, with my colleague's indulgence. One answer to some of the concerns that I've been raising about the government's case is, well, Weimert had a fiduciary duty to IDI, and that that distinguishes this case from other sorts of just negotiation kinds of cases. There's two responses, or two-part answers to that question, as well. If this were an honest services case, there would have to be some side payment by a third party, undisclosed kickback, and that's why I started with that discussion of disclosure, exactly. The other part of it is that it was his involvement that got this deal done. You bet he got a 4% bonus, but he put together a deal in 2008 when no one was touching anything. Developing commercial real estate in Texas. Exactly. And he got that piece of property sold. So, you say, well, he didn't shoot straight with his employer. Well, that's an employee-employer problem. It's not a criminal prosecution under these circumstances. All right. Thank you, Mr. Meyer. Thank you. Mr. Trew. Good morning, Your Honors. Tony Trew for the United States. I want to start off by addressing something Judge Hamilton just said, and that's the fiduciary duty. The reason the fiduciary duty is important in this case is because when the court said just now every term is up for negotiation, those key terms, the 4 and 7-8% ownership interest and the fee, the way that Mr. Weimer explained it to the board and explained it to his supervisors prior to the board meeting is that those terms aren't up for negotiation, and he's a fiduciary. He's what they're relying on in order to determine the truth of the transaction. I understand that argument, but I also, and if this were an undisclosed side deal, no He has disclosed the conflict of interest. It is out there for everybody to see. The board brings in its lawyer and says, in essence, eyes wide open, we've got to do this. We need the cash from this deal, so we need to make this happen. Now, I would have thought that the best way to answer that question that Mr. Omachinsky and the other folks involved had would be to ask the Burks. Correct. Right? Yes. He never did. He never did. And, in fact, in terms of the materiality of Mr. Weimer's participation in this deal, I don't understand if these statements were so material how neither side apparently raised the issue in the continuing negotiations to close the deal where even the price changes by $300,000. Right? That's right, Your Honor, but let me explain that for just a second. You have to understand the context of the actual board of directors and their personal involvement in the day-to-day operation of IDI. Once they approve the deal, Mr. Weimer takes on the rest. Who closed the deal? They kicked Weimer out of the meeting appropriately so they can talk about his conflict of interest. Does he have any further involvement in the negotiations to close? Yes, he has the rest of the involvement. He is the president of IDI and he's the only executive officer of IDI. Who testified about those later negotiations? I know he's the president, but the board has also said he's acting under a conflict of interest. Your Honor, I don't know the answer to that right now. I don't know who specifically testified to that, but the testimony of the board of directors, let's just say this. Look, somebody had to come back and get approval to reduce the price, right? Correct. By $300,000. Yes. Because the board had thought they were selling for $8 million. I know the answer to that is not in the record, but I'll explain this to you for just a second. The board of directors, all of them testified that their involvement in this transaction was only to approve it and nothing else. They were not involved in the transaction. Let me tell you why. Mr. Bergstrom, if you look at his testimony, he's actually running car dealerships off in Menasha, Wisconsin, and Doug Timmerman, he's in Florida. He's retired in Florida. The other board of directors is also retired in Florida. These folks aren't doing the day-to-day operations of IDI. We have what evidence about the closing of this transaction? I don't know right now, Your Honor. I have to get back. I can submit something to the court and ask Lee to do that as well. Can you answer the question about whether the bank's loan to the Berks was recourse or not? I don't think there's any evidence in the record as to whether or not it's a recourse or not. Let me be very frank about what concerns me about this. Sure. I've got some other hypotheticals and so on, but it seems to me that you're making ... This case comes very close to making negotiations subject to federal criminal prosecutions at the discretion of the U.S. attorney and grand jury. It also looks to me as if you all are trying to grab the minnow in this pond, Mr. Weimert, while a whole lot of TARP money drifts by with sharks sending it upstream to the holding company. I can address that. None of that ... This case comes to the court in the context of a Rule 29 and Rule 33 motion. We're looking at the evidence that the jury looked at. The evidence didn't look at that. I'm sorry. The jury did not look at that evidence. Did not look at the actual ... The exhibit that was plopped into the defendant's brief is not actually something that the jury ever saw. One thing that we did hear from the testimony of Chuck Jackson is that the transaction was approved. It was actually something the regulator had full disclosure on, meaning the bank regulator. That's something, I guess ... The bank regulators approved Anchor Bank lending the $6 million to the Burks to pay the cash to the holding company ... Correct. Exactly. That's what happened during that time period. To answer the question of the $311,000 fee and whether or not IDI actually ever paid the bank back, Mark Timmerman specifically testified that there's internal accounting transactions that were done to pay that money back. Whether it's that they forgave a loan that IDI had, he wasn't specific about that, but it was actually accounted for. It's not as if IDI never paid back the money. The other concern of the court as to the statements in negotiation and whether statements in negotiation could give rise to a wire fraud scheme. I think what's important to note here is that the statements that Mr. Weimert made, either to Mr. Petershak, to the Burks, or to Calco, all third parties in this case, all those statements were made so that he could present an inevitable choice to the board of directors. That is, I'm either in the deal this way or the other way. He's bluffing, right? He's bluffing to whom? Everybody. He is bluffing to everybody, that's correct. Right. This happens in negotiations. Correct. But the thing that stops a regular negotiation from becoming a wire fraud is intentative fraud, which we have here, because he made direct misrepresentations to the board, and he made both orally and in writing. About other people's intentions, correct? In their negotiation? No. Yes. About what would happen. The key question, in essence, was what happens if we go back to the Burks, at the board meeting, and say we want to renegotiate so that, in essence, we cut Weimert out of this deal? That's the key question he's asked. Correct. He says, in essence, that will kill the deal, right? Correct. He's making a representation about the negotiating position of the other party in the negotiation. That's correct. Right? Okay. So. Those are different, that misrepresentation is a different misrepresentation than a misrepresentation to Burke and Kalko, which is what you're referring to, the normal negotiation, not telling somebody they're a stalking horse. Well, but by the time those representations are made, the conflict of interest is way out in the open, the board is going forward, I don't see how they can trust Weimert at all at that point on those kinds of issues, and I don't see why representations about anybody's negotiating position should be deemed material for purposes of wire fraud. The jury did hear each board member say they did trust Weimert. They had to trust Weimert because they're not daily participants in IDI, and so that's the only evidence the jury had, and so what the inference is drawn from there is that it was material to them. But more importantly, it has such a tendency. You can, anybody in any negotiation can say I trusted the person I was dealing with, right? Most happy negotiations that end with a deal involve some degree of trust, but let's take the hypothetical, okay? Let's suppose, I was going to ask you about a car, buying a car, but let's make it buying a commercial building. I'm the buyer. Okay. I think the building might be, and it's on the market for $32 million, okay? I think it's probably worth $30, and I offer $27, okay? Seller comes back and says, I'm not going to take $27, but I'll take $30. I respond, no, that's not good enough, okay? But, and eventually we close at $29, okay? Turns out all along, if you look at the negotiating team's emails, you guys go in and investigate, you look at the negotiating team's emails, the seller's reserve price was $28 million. The buyer's reserve price was $30 million, closes at $29. They've each misrepresented to the other, in order to gain an advantage in the negotiations, their bottom line positions. And it looks like each has committed wire fraud, and defrauded the other out of a million dollars. Now that can't be right, right? That's correct. It's not right. Okay, so what's the difference between that case and this one? The difference is that there's intent to defraud in this case, and there's no intent to defraud. How do we see that? If I'm trying to get more of your property that you're selling for less than I'm actually willing to pay for it. It's because Mr. Weimer's not in a negotiating position against his board of directors. He's a fiduciary. Sure he is. He's a party to the transaction at this point. He's not yet. They haven't waived the conflict of interest. That's the point. He gets them. He induces them to waive the conflict of interest by misrepresentations. At that point, they're not at arm's length. Based only, though, on what the negotiating positions of other parties are, right? Yeah, which he knows not to be true, and he knows not to be true because his SEC testimony, he says that. He says, I was never required to be part of the deal by the Berks. I'm the one who inserted myself in the deal. I'd like to participate in the deal. He's bluffing. Sure. This happens in deals. These are capitalist acts among consenting adults, right? I'm sorry. He's not bluffing when he's talking to the SEC. He's actually under oath, and he's telling the SEC that it's his idea to be part of the deal. Yeah, yeah. Of course. He was earmarking the deal, so he's telling the truth. Yes. That's evidence that he knew that the Berks never required him to be part of the deal. In my hypothetical, I knew that I was willing to pay more than I told you I was willing to pay. The difference, again, is that they're not at arm's length. This is a CEO of a corporation. With the waiver, they're at arm's length, I would suggest. After the waiver? Yes, but the crime's already been committed. The scheme's over. He hasn't gotten a thing at that point. It's not until the deal closes and there's negotiation, right? You don't have to get a thing under the wire fraud statute. You have to only scheme to defraud. You have to- This is attempt? Is that- Yep. You have to devise a scheme to defraud, and you have to cause a wire and furtherance of the scheme to defraud. So never at any point do you have to obtain any property. So it doesn't matter that he hasn't obtained the property yet. The scheme's complete at the time of the lie and the time of causing a wire and furtherance of it. The other thing I wanted to address briefly, Your Honor, is the very first thing that Mr. Meyer said when he got up here, which is disclosure. Somehow he disclosed to the board of directors what was going on early through an email that was sent by the attorney to Mark Timmerman. The issue that he's raising, let's just say that is true, but I don't think that's true. That wasn't the testimony. The issue that he's raising is something that was covered by this court in Turner. It's been covered over and over again, which is the fact that somebody knows that something is a lie when they're told it's a lie, or when they're told the lie, doesn't mean it's not material, because material looks at the tendency to influence. It doesn't look at- Yeah. I understand that. Okay, good. Wire fraud is very broad. It's dangerously broad, as Justice Scalia has often written, for example. But can you direct us to comparable cases in which the fraud, the misrepresentations and omissions had to do with negotiating positions? Cosentino. In Cosentino, what Rob Co, what the CEO of the insurance company, which was Kenilworth Insurance Corporation, what the CEO was telling, the misrepresentations that occurred is the Rob Co Insurance, another insurance corporation run by another party, we will share profits from the premiums at 30 percent, we'll pull out 30 percent. But in reality, they had come up with a scheme to pull out 90 percent. Was that a misrepresentation to the insurance regulators? No, it was an omission from an insurance regulator, because the insurance regulators never knew what was going on. But however, the misrepresentations that occurred were misrepresentations basically to the Kenilworth Corporation CEO is negotiating with Rob Co and essentially saying, Rob Co, let's come up with a plan where we take out 90 percent of the premiums as opposed to 30 percent of the premiums. That's one example. Was that a closed deal, or were you talking about negotiations? It was a negotiated, well, actually, it was an agreement, a written agreement that they came up with. Right. That they were negotiating. And that they then, sure, any agreement is going to have been negotiated, but I'm talking about where the fraud, the key misrepresentations or omissions had to do with negotiating positions in the process of negotiation, rather than concealing the terms of your final transaction from insurance regulators. I don't know the answer to that, but. Okay, this case seems to me to break very new ground. I don't think so, because what he's doing is he's lying to his board of directors. Not about a negotiation, not like the lies that occur between Kalka and Burks. Not those kind of lies. The lie is a statement of fact. The Burks require my involvement. They require me to. It's not a statement of fact. That's a statement of their intentions, how they will respond to a counteroffer that changes that term, right? It's a statement of fact in that he's saying that they require my involvement. That's a fact, whether or not they require. That is not a fact. And if I can finish answering the question, Your Honor. Please. Okay. There's also statement of facts that he makes, or I'm sorry. He also makes other statements in his writings that I believe are statement of facts. I had no intention of being involved in this deal. My involvement in this deal is truly evolutionary. It's an inadvertent thing, is what he calls it. Those are all statements of fact. Statements of fact that he knows to be false. Statements of fact that he makes to somebody who's not in an arm's length negotiation. Simply conclude, Your Honor, by asking the court to affirm the judgment of conviction and affirm the district court's post-trial motions in this case, unless the court has any other questions. If you could hang on just a second, I'd like to check some notes. Mr. Trio, in your brief, you made a good deal out of the theory that Mr. Weimert defrauded Mr. Kalka and misled him by not telling him that his bid was a, quote, stalking horse. Do you stand by that theory as a basis for conviction here? What we said in the brief and what the jury instructions actually instructed the jury was that, not that Mr. Kalka was defrauded, but that IDI was defrauded through misrepresentation, or I'm sorry, an omission of fact, a material omission of fact from Kalka. It was part of the scheme to do that. So we've never said that Mr. Kalka was defrauded, and we do stand by that. I mean, he had a breakup fee, right, in his deal? Kalka didn't? Yes, he did. So he knows he's being used, and he's also willing to buy this if he gets a good deal. I imagine he was a little baffled as to why $8.5 million didn't beat an $8 million bid. That was not the testimony of Mr. Kalka. The testimony of Mr. Kalka is that he did not know he was being used, that he actually was told, bid 8.5 and you're going to get it. I would think so. Why didn't he get it? I think the testimony was that he didn't, the reason he didn't get it is because the Burks were able to negotiate with Bank of America, who had another lien on the property, were able to negotiate a waiver of a guarantee that I.D.I. had on that particular loan. So that got him out of that, okay. I think that covers, I could ask you hypotheticals for a while longer, but I don't know that we'd pursue it any further, we'd make progress. Thank you.  Thank you, Your Honors. All right. Thank you, Mr. Trio. Mr. Meyer, your time has expired, but we'll give you an additional two minutes. To answer some of the Court's questions about the record, first of all, in terms of the That was used to summarize the testimonies from Doug Timmerman and Mark Timmerman. The information that is contained on that chart was all elicited during the testimony of the two Timmermans. It was the easiest way to encapsulate it. Number two, the question about the closing. There was no testimony other than what Attorney Petersheck testified to. Now the 7.7 end price showed up in other locations, such as the Board of Director Minutes, which how did they know on February 20th? After the fact. Yeah. But the 7.7 was in the Board of Director Minutes, and Petersheck talked about the closing. There was no evidence. Was Weimert involved in the further negotiations to close? There was no evidence whatsoever that he was involved. He testified in the trial. He testified. There was never any testimony about that or cross-examination. Now, the court also asked about, or there was some discussion about Constantino. That was an omission to regulators, which had an impact on policyholders who continued to funnel money into the insurance company. That was the real fraud, or the practical consequences of the fraud. Mr. Kalka did wonder why he didn't get the deal. I believe that it was because the ultimate contract required due diligence, which would have taken Mr. Kalka time to complete. Berks could do it because they are already half owners. I leave the court with this thought. In 2008, when people were buying commercial property, there was always a question of, are you trying to unload a turkey on me? There was frequently, Jamie Dimon being the most famous example, you have to have some skin in the game. That's what happened here. Thank you. Just one last question. How much of his sentence has Mr. Weimert served at this point? He went in in September, Your Honor, so I can't remember the exact date, September, so we're at about four or five months. Thank you. Thank you. Thank you, Mr. Meier. Thank you, Mr. Trejo. The case is taken under advisement.